# United States Court of Appeals for the Federal Circuit

_____

**JOHN BERRY, DIRECTOR, OFFICE OF PERSONNEL MANAGEMENT,**
*Petitioner,*

v.

**RHONDA K. CONYERS AND DEVON HAUGHTON NORTHOVER,**
*Respondents,*

**and**

**MERIT SYSTEMS PROTECTION BOARD,**
*Respondent.*

_____

2011-3207

_____

Petition for Review of the Merit Systems Protection Board in Consolidated Case Nos. CH0752090925-R-1 and AT0752100184-R-1.

_____

Decided: August 17, 2012

_____

ABBY C. WRIGHT, Attorney, Appellate Staff, Commercial Litigation Branch, United States Department of Justice, of Washington, DC, argued for petitioner. With her on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, TODD M.

HUGHES, Deputy Director, ALLISON KIDD-MILLER, Senior Trial Counsel, and DOUGLAS N. LETTER, Attorney. Of counsel on the brief were ELAINE KAPLAN, General Counsel, KATHIE A. WHIPPLE, Deputy General Counsel, STEVEN E. ABOW, Assistant General Counsel, Office of the General Counsel, Office of Personnel Management, of Washington, DC.

ANDRES M. GRAJALES, American Federation of Government Employees, of Washington, DC, argued for respondents Rhonda K. Conyers and Devon Haughton Northover. With her on the brief were DAVID A. BORER, General Counsel, and JOSEPH F. HENDERSON, Deputy General Counsel.

JEFFREY A. GAUGER, Attorney, Office of the General Counsel, Merit Systems Protection Board, of Washington, DC, argued for respondent. With him on the brief were JAMES M. EISENMANN, General Counsel, and KEISHA DAWN BELL, Deputy General Counsel.

ARTHUR B. SPITZER, American Civil Liberties Union of the Nation's Capital, of Washington, DC, for amici curiae American Civil Liberties Union of the National Capital Area. With him on the brief were GREGORY O'DUDEN, General Counsel, LARRY J. ADKINS, Deputy General Counsel, JULIE M. WILSON, Associate General Counsel, and PARAS N. SHAH, Assistant Counsel, National Treasury Employees Union, of Washington, DC.

---

Before LOURIE, DYK, and WALLACH, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* WALLACH.
Dissenting opinion filed by *Circuit Judge* DYK.

WALLACH, *Circuit Judge*.

The Director of the Office of Personnel Management ("OPM") seeks review of the decision by the Merit Systems Protection Board ("Board") holding that the Supreme Court's decision in *Department of the Navy v. Egan*, 484 U.S. 518 (1988), limits Board review of an otherwise appealable adverse action only if that action is based upon eligibility for or a denial, revocation, or suspension of access to classified information. *Egan*, however, prohibits Board review of agency determinations concerning eligibility of an employee to occupy a "sensitive" position, regardless of whether the position requires access to classified information. Accordingly, we REVERSE and REMAND.

## I.   BACKGROUND

Rhonda K. Conyers ("Conyers") and Devon Haughton Northover ("Northover" and collectively, "Respondents")[1] were indefinitely suspended and demoted, respectively, from their positions with the Department of Defense ("Agency") after they were found ineligible to occupy "noncritical sensitive" positions.[2]   Ms. Conyers and Mr.

---

[1]   Although the Board, Ms. Conyers, and Mr. Northover are all Respondents, we refer to the Board as the "Board" and "Respondents" will refer to Ms. Conyers and Mr. Northover.

[2]   Departments and agencies of the Government classify jobs in three categories: "critical sensitive," "noncritical sensitive," and "nonsensitive." *Egan*, 484 U.S. at 528.  The underlying cases involve "noncritical sensitive" positions, which are defined as: *"Positions with potential to cause damage to . . . national security,* up to and including damage at the significant or serious level.  These positions include: (1) Access to Secret, "L," Confidential classified information[;] (2) *Any other positions with*

Northover independently appealed the Agency's actions to the Board. In both appeals, the Agency argued that, because Respondents' positions were designated "noncritical sensitive," the Board could not review the merits of the Agency's determinations under the precedent set forth in *Egan*.

A. The *Egan* Holding

In *Egan*, the Supreme Court held that the Board plays a limited role in adverse action cases involving national security concerns. The respondent in *Egan* lost his laborer's job at a naval facility when he was denied a required security clearance. 484 U.S. at 520. Reversing our decision in *Egan v. Department of the Navy*, 802 F.2d 1563 (Fed. Cir. 1986), *rev'd*, 484 U.S. 518 (1988), the Court held that the Board does not have authority to review the substance of the security clearance determination, contrary to what is required generally in other adverse action appeals. 484 U.S. at 530-31. Rather, the Court held that the Board has authority to review only: (1) whether an Executive Branch employer determined the employee's position required a security clearance; (2) whether the clearance was denied or revoked; (3) whether the employee was provided with the procedural protections specified in 5 U.S.C. § 7513; and (4) whether transfer to a nonsensitive position was feasible. *Id.* at 530.

B. Ms. Conyers's Initial Proceedings

Ms. Conyers occupied a competitive service position of GS-525-05 Accounting Technician at the Defense Finance and Accounting Service. *Conyers v. Dep't of Def.*, 115 M.S.P.R. 572, 574 (2010). Following an investigation, the Agency's Washington Headquarters Services ("WHS")

---

*potential to cause harm to national security to a moderate degree . . . .*" J.A. 326 (emphasis added).

Consolidated Adjudications Facility ("CAF") discovered information about Ms. Conyers that raised security concerns. J.A. 149-52. As a result, effective September 11, 2009, the Agency indefinitely suspended Ms. Conyers from her position because she was denied eligibility to occupy a sensitive position by WHS/CAF. *Conyers*, 115 M.S.P.R. at 574. The Agency reasoned that Ms. Conyers's noncritical sensitive "position required her to have access to sensitive information," and because WHS/CAF denied her such access, "she did not meet a qualification requirement of her position."[3] *Id.* at 574.

Ms. Conyers appealed her indefinite suspension to the Board. *Id.* In response, the Agency argued that *Egan* prohibited Board review of the merits of WHS/CAF's decision to deny Ms. Conyers eligibility for access "to sensitive or classified information and/or occupancy of a sensitive position." *Id.* On February 17, 2010, the administrative judge issued an order certifying the case for an interlocutory appeal and staying all proceedings pending resolution by the full Board. *Id.* at 575. In her ruling, the administrative judge declined to apply *Egan* and "informed the parties that [she] would decide the case under the broader standard applied in . . . other [5 U.S.C.] Chapter 75 cases which do not involve security clearances." *Id.* (brackets in original).

---

[3] The record indicates that Ms. Conyers requested an appearance before an administrative judge with the Defense Office of Hearings and Appeals ("DOHA") regarding her denial of eligibility to occupy a sensitive position. *Conyers*, 115 M.S.P.R. at 574; J.A. 123. DOHA ultimately denied relief. *Conyers*, 115 M.S.P.R. at 574. The Agency subsequently removed Ms. Conyers effective February 19, 2010. *Id.*

C.  Mr. Northover's Initial Proceedings

Mr. Northover occupied a competitive service position of GS–1144–07 Commissary Management Specialist at the Defense Commissary Agency. *Northover v. Dep't of Def.*, 115 M.S.P.R. 451, 452 (2010). Effective December 6, 2009, the Agency reduced Mr. Northover's grade level to part-time GS–1101–04 Store Associate "due to revocation/denial of his Department of Defense eligibility to occupy a sensitive position." *Id.* at 453.  In its Notice of Proposed Demotion, the Agency stated that Mr. Northover was in a position that was "designated as a sensitive position" and that WHS/CAF had denied him "eligibility for access to classified information and/or occupancy of a sensitive position." *Id.* at 453 (citation omitted).

Mr. Northover subsequently appealed the Agency's decision to the Board. *Id.*  In response, the Agency argued it had designated the Commissary Management Specialist position a "moderate risk" national security position with a sensitivity level of "noncritical sensitive," and under *Egan*, the Board is barred from reviewing the merits of an agency's "security-clearance/eligibility determination." *Id.*

On April 2, 2010, contrary to the ruling in *Conyers*, the presiding chief administrative judge ruled that *Egan* applied and that the merits of the Agency's determination were unreviewable. *Id.*  The chief administrative judge subsequently certified his ruling to the full Board. *Id.*  All proceedings were stayed pending resolution of the certified issue. *Id.*

D. The Full Board's Decision in *Conyers* and
    *Northover*

On December 22, 2010, the full Board affirmed the administrative judge's decision in *Conyers* and reversed

the chief administrative judge's decision in *Northover*, concluding that *Egan* did not apply in cases where security clearance determinations are not at issue. *Conyers*, 115 M.S.P.R. at 590; *Northover*, 115 M.S.P.R. at 468. Specifically, the Board held that *Egan* limited the Board's review of an otherwise appealable adverse action only if that action is based upon eligibility for or a denial, revocation, or suspension of access to classified information. [4] *Conyers*, 115 M.S.P.R. at 590; *Northover*, 115 M.S.P.R. at 467-68. Because Ms. Conyers and Mr. Northover did not occupy positions that required access to classified information, the Board concluded that *Egan* did not preclude Board review of the underlying Agency determinations. *Conyers*, 115 M.S.P.R. at 585; *Northover*, 115 M.S.P.R. at 464.

OPM moved for reconsideration of the Board's decisions, which the Board denied. *Berry v. Conyers, et al.*, 435 F. App'x 943, 944 (Fed. Cir. 2011) (order granting OPM's petition for review). OPM petitioned for review to this court, and the petition was granted on August 17, 2011. *Id.* We have jurisdiction to review the Board's final decision under 5 U.S.C. § 7703(d) and 28 U.S.C. § 1295(a)(9).[5]

---

[4] The Board considered "security clearance" to be synonymous to "access to classified information." *Conyers*, 115 M.S.P.R. at 580.

[5] On remand, *Conyers* was dismissed as moot, and *Northover* was dismissed without prejudice to file again pending the resolution of this petition. J.A. 900-05; 1821. To the extent there are any Article III case or controversy concerns as a result of these dismissals, we find that OPM, at the least, maintains sufficient interests in this petition to satisfy any Article III case or controversy requirement. *See Horner v. Merit Sys. Protection Bd.*, 815 F.2d 668, 671 (Fed. Cir. 1987) ("We have no

## II. STATUTORY GROUNDS FOR NATIONAL SECURITY BASED REMOVAL OF GOVERNMENT EMPLOYEES

The statutes provide a two-track system for removal of employees based on national security concerns. *Egan*, 484 U.S. at 526. In particular, relevant provisions of the Civil Service Reform Act of 1978 ("CSRA" or the "Act"), Chapter 75 of Title 5 of the United States Code entitled, "Adverse Actions," provides two subchapters related to removals. The first, subchapter II (§§ 7511-7514), relates to removals for "cause." Under § 7512, an agency's indefinite suspension and a reduction in grade of an employee, as here, may qualify as "adverse actions." 5 U.S.C. § 7512(2)-(3). An employee subject to an adverse action is entitled to the protections of § 7513, which include written notice of the specific reasons for the proposed action, an opportunity to respond to the charges, the requirement that the agency's action is taken to promote the efficiency of the service, and the right to review by the Board of the action. An employee removed for "cause" has the right, under § 7513(d), to appeal to the Board. On review of the

---

question that the issue of the [Office of Special Counsel]'s authority to bring a general disciplinary action against an employee, and in turn the issue of the board's jurisdiction to hear such a case, the latter being dependent on the former, is of vital interest to OPM, which has administrative responsibility for personnel practices and policies throughout most parts of government. These interests are more than sufficient to satisfy the section 7703(d) requirements and any Article III case or controversy requirement."); *see also Berry*, 435 F. App'x at 945 (granting petition for review because "[w]e agree that the issues in the Board's orders raise an issue of such interest, i.e., whether the agency must disclose its determinations regarding what it classifies as issues of national security and must litigate the merits of such a determination, and thus are subject to immediate review.").

action by the Board under § 7701,[6] the Board may sustain the agency's action only if the agency can show that its decision is supported by a preponderance of the evidence. 5 U.S.C. § 7701(c)(1)(B). [7]

The second, subchapter IV (§§ 7531-7533), relates to removals based upon national security concerns. An employee suspended under § 7532(a) is not entitled to appeal to the Board. Nonetheless, the statute provides for a summary removal process that entitles the employee to specified pre-removal procedural rights, including a hearing by an agency authority. 5 U.S.C. § 7532(c).

III. *EGAN*'S APPLICATION TO *CONYERS* AND *NORTHOVER*

The Board and Respondents urge this court to limit *Egan*'s application to security clearance determinations, reasoning that national security concerns articulated in that case pertain to access to classified information only. *Egan* cannot be so confined. Its principles instead require that courts refrain from second-guessing Executive Branch agencies' national security determinations concerning eligibility of an individual to occupy a sensitive position, which may not necessarily involve access to

---

[6]    5 U.S.C. § 7701 provides, in relevant part: "An employee, or applicant for employment, may submit an appeal to the Merit Systems Protection Board from any action which is appealable to the Board under any law, rule, or regulation." 5 U.S.C. § 7701(a). It is undisputed that Respondents are "employees" as defined in the applicable statutes in this case. *See* 5 U.S.C. § 7511(a)(1)(A) ("[E]mployee means . . . an individual in the competitive service . . . .").

[7]    The two cases on appeal here proceeded pursuant to 5 U.S.C. § 7513(d).

classified information. For the following reasons, *Egan* must apply.

A. *Egan* Addressed Broad National Security Concerns That Are Traditionally the Responsibility of the Executive Branch

*Egan*, at its core, explained that it is essential for the Executive Branch and its agencies to have broad discretion in making determinations concerning national security. Affording such discretion to agencies, according to *Egan*, is based on the President's "authority to classify and control access to information bearing on national security and to determine" who gets access, which "flows primarily from [the Commander in Chief Clause] and exists quite apart from any explicit congressional grant." 484 U.S. at 527. *Egan* also recognized the general principle that foreign policy is the "province and responsibility of the Executive." *Id.* at 529 (citation omitted). Accordingly, the Court reasoned:

> [I]t is not reasonably possible for an outside non-expert body to review the substance of such a[n agency determination concerning national security] and to decide whether the agency should have been able to make the necessary affirmative prediction [that a particular individual might compromise sensitive information] with confidence. Nor can such a body determine what constitutes an acceptable margin of error in assessing the potential risk.

*Id.* Hence, unless Congress specifically has provided otherwise, courts traditionally have shown "great deference" to what "the President—the Commander in Chief—has determined . . . is essential to national security." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24, 26 (2008) (citation omitted).

Despite the undisputed role of the Executive within this realm, Respondents argue applying *Egan* to these cases "may deprive either the Congress or the Judiciary of all freedom of action merely by invoking national security." Resp'ts' Br. 23. Certainly, under the Constitution, Congress has a substantial role in both foreign affairs and national security. Congress, therefore, has the power to guide and limit the Executive's application of its powers. Nevertheless, no controlling congressional act is present here.

As *Egan* recognized, the CSRA did not confer broad authority to the Board in the national security context.[8]

---

[8] The dissent states the majority has "completely fail[ed] to come to grips with the [CSRA]." Dissent Op. at 7. In 1990, the CSRA was amended after the Court's decision in *U.S. v. Fausto*, 484 U.S. 439 (1988). There, the Court decided that the CSRA's silence regarding appeal rights for non-preference eligible members of the excepted service reflected congressional intent to preclude any review under chapter 75 for such employees. *Id.* at 448. In response, Congress passed the Civil Service Due Process Amendments ("1990 Amendments") expanding the Board's jurisdiction to some, but not all, non-preference eligible excepted service employees. Pub. L. No. 101–376, 104 Stat. 461 (1990).

The dissent construes the 1990 Amendments as extending by implication Board review of agency determinations concerning sensitive positions. Dissent Op. at 10. Because certain agencies, such as the Federal Bureau of Investigation, Central Intelligence Agency, and National Security Agency were expressly exempted, the dissent posits that Board review must extend to all other positions that were not excluded. *Id.* at 11. Certain employees of the General Accounting Office, the Veterans Health Sciences and Research Administration, the Postal Service, the Postal Rate Commission, and the Tennessee Valley Authority, however, were also excluded, because separate statutes excluded the employees of these agencies from the normal appeals process. H.R. Rep. No. 101-328 at 5

484 U.S. at 530-31 ("An employee who is removed for 'cause' under § 7513, when his required clearance is denied, is entitled to the several procedural protections specified in that statute. The Board then may determine whether such cause existed, whether in fact clearance was denied, and whether transfer to a nonsensitive position was feasible. *Nothing in the Act, however, directs or*

---

(1989), *reprinted in* 1990 U.S.C.C.A.N. 695. Thus, the dissent's view that Congress "crafted some exceptions for national security and not others" is speculative because "national security" was not a factor providing for these exclusions.

      Similarly, the dissent refers to the Department of Defense's ("DOD") creation of the National Security Personnel System ("NSPS") in 2003 to further support the notion that Congress spoke on the issue before this court. Dissent Op. at 15. The dissent's position is neither supported by statutory language nor legislative history. The statute creating the NSPS, the subsequent repeal of certain regulations concerning the DOD's appeals process, and the ultimate repeal of the statute creating the NSPS itself in 2009, do not show that Congress intended to preclude the DOD from insulating employment decisions concerning national security from Board review. NSPS was established to overhaul the then-existing personnel management system and polices of the DOD. *See* National Defense Authorization Act, Pub. L. 108–136, 117 Stat. 1392 (2003). In 2009, NSPS was repealed largely due in part to strong opposition from labor organizations regarding issues of collective bargaining. *See* Department of Defense Human Resources Management and Labor Relations Systems, 70 Fed. Reg. 66,123; *see also* S. Rep. No. 111-35 at 185 (2009) ("[T]he committee has received many complaints from DOD employees during the 5 years during which the [DOD] has sought to implement NSPS, to the detriment of needed human capital planning and workforce management initiatives."). There is nothing in these statutes that shows Congress intended Board review of agency determinations pertaining to employees in sensitive positions.

*empowers the Board to go further*.") (emphasis added). As a result, Congress presumably has left the President and Executive Branch agencies broad discretion to exercise their powers in this area. *See Dames & Moore v. Regan*, 453 U.S. 654, 678 (1981) ("Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take or every possible situation in which he might act," and "[s]uch failure of Congress . . . does not, 'especially . . . in the areas of foreign policy and national security,' imply 'congressional disapproval' of action taken by the Executive.") (quoting *Haig v. Agee*, 453 U.S. 280, 291 (1981)). Accordingly, when "the President acts pursuant to an express or implied authorization from Congress," his actions should be "supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion . . . rest[s] heavily upon any who might attack it." *Id.* at 668 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)). Courts thus must tread lightly when faced with the potential of second-guessing discretionary agency determinations concerning national security.

The existence of § 7532 does not alter the agencies' broad discretion to exercise their powers in the national security context. The Board and Respondents argue that Congress has spoken directly on the issue of removal for national security concerns by enacting § 7532, and that applying *Egan* in this instance "would in essence allow the Executive to replace § 7532 with § 7513 . . . rendering § 7532 a nullity." Resp'ts' Br. 24-25; *see* Board's Br. 42-43. This argument is similar, if not identical, to those rejected by the *Egan* Court. 484 U.S. at 533 ("The argument is that the availability of the § 7532 procedure is a 'compelling' factor in favor of Board review of a security-clearance denial in a case under § 7513.").

In *Egan*, the Court observed the alternative availability of § 7513 and § 7532. *Id.* at 532. Specifically, the Court acknowledged that § 7532 does not preempt § 7513 and that the two statutes stand separately and provide alternative routes for administrative action. *Id.* In addition, the Court found that the two sections were not anomalous, but merely different. *Id.* at 533. The Court also found that one section did not necessarily provide greater procedural protections than the other. *Id.* at 533-34.

The Court in *Carlucci v. Doe*, 488 U.S. 93 (1988), further articulated and clarified § 7532's applicability. In that case, the Court determined that the summary removal mechanism set out in § 7532, as well as 50 U.S.C. § 833,[9] were discretionary mechanisms in cases involving dismissals for national security reasons. *Id.* at 100. The Court found that § 7532 was not mandatory, but rather permissive: "'Notwithstanding other statutes,' the head of an agency 'may' suspend and remove employees 'in the interests of national security.'" *Id.* (quoting § 7532) (finding nothing in the legislative history of § 7532 indicating that the statute's procedures are the exclusive means for removals on national security grounds or that § 7532 displaces the otherwise applicable removal provisions of the agencies covered by the section). Therefore, it was held that the National Security Agency was not required to apply either § 7532 or § 833 and could have acted under

---

[9]    50 U.S.C. § 833 was a summary removal provision in the 1964 National Security Agency Personnel Security Procedures Act, 50 U.S.C. §§ 831-35 (repealed October 1, 1996).

its ordinary dismissal procedure if it so wished.[10] *Id.* at 99-100.

Moreover, *Carlucci* held that Congress enacted § 7532 to "supplement, not narrow, ordinary agency removal procedures." *Id.* at 102. The Court reasoned that because of its summary nature, "Congress intended § 7532 to be invoked only where there is 'an immediate threat of harm to the national security' in the sense that the delay from invoking 'normal dismissal procedures' could 'cause serious damage to the national security.'" *Id.* (quoting *Cole v. Young*, 351 U.S. 536, 546 (1956)). Consequently, should § 7532 be mandatory as the Board and Respondents effectively argue, it would become the exclusive procedure in this case and similar cases, and "no national security termination would be permissible without an initial suspension and adherence to the *Cole v. Young* standard." *Id.* Given *Carlucci*'s teaching, we are unconvinced that Congress intended any such result when it

---

[10] The *Carlucci* Court also affirmed *Egan*'s conclusion regarding §§ 7513 and 7532:

> We thus agree with the conclusion of the Merit Systems Protection Board in a similar case that "section 7532 is not the exclusive basis for removals based upon security clearance revocations," *Egan v. Department of the Navy*, 28 M.S.P.R. 509, 521 (1985), and with the Court of Appeals for the Federal Circuit that "[t]here is nothing in the text of section 7532 or in its legislative history to suggest that its procedures were intended to preempt section 7513 procedures whenever the removal could be taken under section 7532. The language of section 7532 is permissive." *Egan v. Department of the Navy*, 802 F.2d 1563, 1568 (Fed. Cir. 1986), *rev'd*, 488 U.S. 518 (1988).

*Carlucci*, 488 U.S. at 104.

enacted § 7532. *Id.* Accordingly, eligibility to occupy a sensitive position is a discretionary agency determination, principally within the purview of the Executive Branch, the merits of which are unreviewable by the Board.

B. *Egan*'s Analysis Is Predicated On "National Security Information"

The Board and Respondents conflate "classified information" with "national security information," but *Egan* does not imply those terms have the same meaning.[11] In fact, *Egan*'s core focus is on "national security information," not just "classified information." 484 U.S. at 527 (recognizing the government's "compelling interest in withholding *national security information*") (emphasis added). As *Egan* noted, the absence of a statutory provision in § 7512 precluding appellate review of determinations concerning national security creates a presumption in favor of review. *Id.* The Court, nevertheless, held that this "proposition is not without limit, and *it runs aground when it encounters concerns of national security*, as in this case, where the grant of security clearance to a particular employee, a sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch." *Id.* (emphasis added).[12] *Egan* therefore is predicated on broad national security concerns, which may or may not include issues of access to

---

[11] Likewise, the dissent's key error is that it conflates "authority to classify and control access to information bearing on national security" with "the authority to protect classified information." Dissent Op. at 24-25.

[12] It is clear from the use of the clause "as in this case" following the "runs aground" clause that national security concerns are the Supreme Court's general proposition, and security clearances simply exemplify the types of concerns falling within this broad category.

classified information.  Thus, *Egan* is not limited to adverse actions based upon eligibility for or access to classified information.

In addition, sensitive positions concerning national security do not necessarily entail access to "classified information" as the Board and Respondents contend.  The Board cites *Cole v. Young* and references the Court's discussion of the legislative history of the Act of August 26, 1950 [13] in support of its proposition that national security concerns relate strictly to access to classified information.  However, the Board's analysis is flawed.

*Cole* held that a sensitive position is one that *implicates* national security, and in defining "national security" as used in the Act of August 26, 1950, the Court concluded that the term "was intended to comprehend only those activities of the Government that are *directly concerned with the protection of the Nation from internal subversion or foreign aggression*, and not those which contribute to the strength of the Nation only through their impact on the general welfare." 351 U.S. at 544 (emphasis added).[14]  Thus, even in *Cole*, sensitive posi-

---

[13]  The Act of August 26, 1950, Pub. L. No. 81-733, ch. 803, 64 Stat. 476 (1950), gave heads of certain departments and agencies of the Government summary suspension and unreviewable dismissal powers over their civilian employees, when deemed necessary in the interest of the national security of the United States. *Conyers*, 115 M.S.P.R. at 580 n.17.  The Act was the precursor to 5 U.S.C. § 7532. *Id.*

[14]  It follows that an employee can be dismissed 'in the interest of the national security' under the Act only if he occupies a *'sensitive' position*, and thus that a condition precedent to the exercise of the dismissal authority is a determination by the agency head that the *position occupied is one affected with the 'national security*.'" *Cole*, 351

tions were defined as those that involve national security information and not necessarily those that involve classified information.

Indeed, "sensitive positions" that can affect national security and "access to classified information" are parallel concepts that are *not* necessarily the same. As the Court reasoned:

> Where applicable, the Act authorizes the agency head summarily to suspend an employee pending investigation and, after charges and a hearing, finally to terminate his employment, such termination not being subject to appeal. There is an obvious justification for the summary suspension power where the employee occupies a "sensitive" position in which he could cause serious damage to the national security during the delay incident to an investigation and the preparation of charges. *Likewise*, there is a reasonable basis for the view that an agency head who must bear the responsibility for the protection of classified information committed to his custody should have the final say in deciding whether to repose his trust in an employee who has access to such information.

*Cole*, 351 U.S. at 546 (emphasis added).[15]   Hence, contrary to the Board and Respondents' contentions, "classi-

---

U.S. at 551 (emphasis added). Accordingly, the Court in *Cole* remanded the case to determine whether the petitioner's position was one in which he could adversely affect national security. *Id.* at 557.

[15]   By using the word, "likewise," the Court compares the two concepts, "sensitive positions" and "access to classified information." In doing so, it makes clear that they are parallel concepts that are not the same.

fied information" is not necessarily "national security information" available to an employee in a sensitive position.

The Board and Respondents' focus on one factor, eligibility of access to classified information, is misplaced.[16] Government positions may require different types and levels of clearance, depending upon the sensitivity of the position sought. *Egan,* 484 U.S. at 528. A government appointment is expressly made subject to a background investigation that varies in scope according to the degree of adverse effect the applicant could have on national security. *Id.* (citing Exec. Order No. 10,450, § 3, 3 C.F.R. 937 (1949-1953 Comp.)). As OPM states: "An agency's national security calculus will vary widely depending upon, *inter alia,* the agency's mission, the particular

---

[16] The centerpiece of the *Egan* analysis, Executive Order No. 10,450, makes no mention of "classified information." Exec. Order No. 10,450, § 3, 3 C.F.R. 937 (1949-1953) ("The head of any department or agency shall designate, or cause to be designated, any position within his department or agency the occupant of which could bring about, by virtue of the nature of the position, *a material adverse effect on the national security as a sensitive position.*") (emphasis added). In addition, other relevant statutes and regulations define "sensitive" position in the broadest sense by referring to "national security" generally. *See* 10 U.S.C. § 1564 ("Security clearance investigations . . . (e) *Sensitive duties.*--For the purposes of this section, *it is not necessary for the performance of duties to involve classified activities or classified matters* in order for the duties to be considered sensitive and critical to the national security.") (emphasis added); *see also* 5 C.F.R. § 732.102 ("(a) For purposes of this part, the term *national security position* includes: (1) Those positions that involve activities of the Government that are *concerned with the protection of the nation from foreign aggression or espionage . . . .*") (emphasis added).

project in question, and the degree of harm that would be caused if the project is compromised." OPM's Br. 33. As a result, an agency's determination in controlling access to national security information entails consideration of multiple factors.

For example, categorizing a sensitive position is undertaken without regard to access to classified information, but rather with regard to the effect the position may have on national security. *See* Exec Order No. 10,450 § 3. Similarly, predictive judgments[17] are predicated on an individual's potential to compromise information, which might be unclassified. Consequently, the inquiry in these agency determinations concerning national security is not contingent upon access to classified information.

Finally, *Egan*'s concerns regarding the agencies' "clearly consistent with the interests of national security" standard conflicting with the Board's preponderance of the evidence standard apply equally here. *Egan* held that:

> As noted above, security clearance normally will be granted only if it is "clearly consistent with the interests of the national security." The Board, however, reviews adverse actions under a preponderance of the evidence standard. § 7701(c)(1)(B). These two standards seem inconsistent. It is difficult to see how the Board would be able to review

---

[17] A predictive judgment of an individual is "an attempt to predict his [or her] possible future behavior and to assess whether, under compulsion of circumstances or for other reasons, he [or she] might compromise sensitive information. It may be based, to be sure, upon past or present conduct, but it also may be based upon concerns completely unrelated to conduct such as having close relatives residing in a country hostile to the United States." *Egan*, 484 U.S. at 528-29.

security-clearance determinations under a preponderance of the evidence standard without departing from the "clearly consistent with the interests of the national security" test. The clearly consistent standard indicates that security-clearance determinations should err, if they must, on the side of denials. Placing the burden on the Government to support the denial by a preponderance of the evidence would inevitably shift this emphasis and involve the Board in second-guessing the agency's national security determinations.

484 U.S. at 531. An agency's determination of an employee's ineligibility to hold a sensitive position must be "consistent with the interests of national security." *See* Exec. Order No. 10,450, § 3. Thus, such agency determinations cannot be reviewable by the Board because this would improperly place an inconsistent burden of proof upon the government. Accordingly, *Egan* prohibits review of Executive Branch agencies' national security determinations concerning eligibility of an individual to occupy a sensitive position, which may not necessarily involve access to classified information.

IV. UNCLASSIFIED INFORMATION CAN HAVE A MATERIAL ADVERSE EFFECT ON NATIONAL SECURITY

National security concerns render the Board and Respondents' positions untenable. It is naive to suppose that employees without direct access to already classified information cannot affect national security. The Board and Respondents' narrow focus on access to classified

information ignores the impact employees without security clearances, but in sensitive positions, can have.[18]

---

[18] There are certainly numerous government positions with potential to adversely affect national security. The Board goes too far by comparing a government position at a military base commissary to one in a "Seven Eleven across the street." Oral Argument at 28:10–15, *Berry v. Conyers, et al.*, 2011-3207, available at http://www.cafc.uscourts.gov/oral-argument-recordings/search/audio.html. Commissary employees do not merely observe "[g]rocery store stock levels" or otherwise publicly observable information. Resp'ts' Br. 20. In fact, commissary stock levels of a particular unclassified item – sunglasses, for example, with shatterproof lenses, or rehydration products – might well hint at deployment orders to a particular region for an identifiable unit. Such troop movements are inherently secret. *Cf. Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 716 (1931) ("When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right . . . . No one would question but that a government might prevent actual obstruction to its recruiting service or the *publication of the sailing dates of transports or the number and location of troops*.") (citing *Schenck v. United States*, 294 U.S. 47, 52 (1919)) (emphasis added). This is not mere speculation, because, as OPM contends, numbers and locations could very well be derived by a skilled intelligence analyst from military commissary stock levels. *See* Oral Argument at 13:19-14:03, *Berry v. Conyers, et al.*, 2011-3207, available at http://www.cafc.uscourts.gov/oral-argument-recordings/search/audio.html (Q: "Can a position be sensitive simply because it provides observability? That is, one of these examples that was given was someone working at a commissary; it seems to me that someone working at a commissary has an opportunity without access to classified information to observe troop levels, potential for where someone is going, from what they are buying, that sort of thing." A: "I think that is right your

Defining the impact an individual may have on national security is the type of predictive judgment that must be made by those with necessary expertise. *See Egan*, 484 U.S. at 529 ("The attempt to define not only the individual's future actions, but those of outside and unknown influences renders the 'grant or denial of security clearances . . . an inexact science at best.'") (quoting *Adams v. Laird*, 420 F.2d 230, 239 (D.C. Cir. 1969)). The sources upon which intelligence is based are often open and publically available. Occasionally, intelligence is obtained from sources in a fashion the source's government would find improper. Occasionally, those means of obtention are coercive and/or subversive.[19]

---

honor. We agree with that, and I think in *Egan*, he, Mr. Egan worked on a nuclear submarine. And so, part of it was simply from what he was observing by coming and going of a nuclear submarine. And so, sensitivity can be the place where the employee works, what are they able to observe, what could they infer from, what you say, from the purchases and shipments . . . .").

[19] For example, the intelligence community may view certain disparaging information concerning an employee as a vulnerability which can be used to blackmail or coerce information out of the individual. *See Egan*, 484 U.S. at 528 (recognizing that the government has a compelling interest in protecting truly sensitive information from those who, "under compulsion of circumstances or for other reasons . . . might compromise sensitive information."); *see also* Exec. Order 10,450, § 8 ("[I]nvestigations conducted . . . shall be designed to develop information as to whether the employment or retention in employment . . . is clearly consistent with . . . national security . . . . Such information [relating, but not limited to] . . . (ii) Any deliberate misrepresentations, falsifications, or omissions of *material facts* . . . (iii) Any criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct, habitual use of intoxicants to excess, drug addiction, sexual perversion, or *financial irresponsi-*

This area of National Security Law is largely about preventing human source intelligence gathering in a manner which does not, in an open society, unnecessarily limit the public's right to access information about its government's activities. Still, there clearly is a need for such prevention. Within the sphere of national security limitations on government employment, our society has determined that courts should tolerate and defer to the agencies' threat limiting expertise. *See id.*

While threats may change with time, *Egan*'s analysis remains valid. The advent of electronic records management, computer analysis, and cyber-warfare have made potential espionage targets containing means to access national security information vastly more susceptible to harm by people without security clearances. The mechanics of planting within a computer system a means of intelligence gathering are beyond the ken of the judiciary; what matters is that there are today more sensitive areas of access than there were when *Egan* was authored. Its underlying analysis, nevertheless, is completely applicable—the President, as Commander-in-Chief, has the right and the obligation, within the law, to protect the government against potential threats. *Egan*, 484 U.S. at 527.

Some rights of government employees are certainly abrogated in national security cases. The Board and Respondents must recognize that those instances are the result of balancing competing interests as was the case in *Egan* and as is the case here. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) ("[T]he process due in any given instance is determined by weighing the 'private interest that will be affected by the official action' against the

---

*bility.*") (emphasis added). Hence, as the Agency found, information regarding Ms. Conyers's debt is a reasonable concern. *See* J.A. 149-52.

Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process.") (quoting *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976)).[20]  Hence, as Lord Cyril Radcliffe noted, security must be weighed against other important questions "in that free dialogue between government . . . and people" out of which public life is built.[21]

In our society, it has been accepted that genuine and legitimate doubt is to be resolved in favor of national security.[22] *See Egan,* 484 U.S. at 527; *see also United*

---

[20]  Working for the government is not only an example of civic duty but also an honorable and privileged undertaking that citizens cannot take lightly.  This is especially true when the government position implicates national security.  In other words, being employed by a government agency that deals in matters of national security is not a fundamental right.  Accordingly, the competing interests in this case undoubtedly weigh on the side of national security.

[21]  218 Parl. Deb., H.L. (5th ser.) (1967) 781-83, available                                        at http://hansard.millbanksystems.com/lords/1967/jul/06/the-d-notice-system-radcliffe-committees        (discussing    the publication of a story concerning national security).

[22]  Although adverse actions of this type are largely unreviewable, courts may examine allegations of constitutional violations or allegations that an agency violated its own procedural regulations. *See, e.g., Egan,* 484 U.S. at 530.  For example, the government's invocation of national security authority does not preclude judicial review in instances involving fundamental rights. *See Hamdi,* 542 U.S. at 529-30 (finding due process violation of those classified as "enemy combatants" and affording great weight to physical liberty as a fundamental right).  On the other hand, courts generally do not accord similar weight to an individual in cases concerning national security where no such fundamental right is implicated. *See, e.g.,*

*States v. Robel*, 389 U.S. 258, 267 (1967) ("[W]hile the Constitution protects against invasions of individual rights, it does not withdraw from the Government the power to safeguard its vital interests . . . . The Government can deny access to its secrets to those who would use such information to harm the Nation.") (citation omitted). That was the philosophical underpinning of *Egan* and it is the holding of this court today. Accordingly, the merits of these agency determinations before us are not reviewable by the Board.

## V. CONCLUSION

For the foregoing reasons, the Board cannot review the merits of Executive Branch agencies' national security determinations concerning eligibility of an employee to

---

*Bennet v. Chertoff*, 425 F.3d 999, 1004 (D.C. Cir. 2005) (holding that substantial evidence of national security concerns as a contemporaneous reason for the agency's action in a Title VII case was enough for resolution in favor of executive discretion). In other very limited circumstances, Title VII claims raised in the context of a security clearance investigation may be justiciable. In *Rattigan v. Holder*, --- F.3d ----, No. 10-5014, 2012 WL 2764347 (D.C. Cir. July 10, 2012), the court held that: (1) "*Egan*'s absolute bar on judicial review covers only security clearance-related decisions made by trained Security Division personnel and does not preclude all review of decisions by other FBI employees who merely report security concerns," *id.* at *3; and (2) "Title VII claim[s] may proceed only if . . . [it can be shown] that agency employees acted with a retaliatory or discriminatory motive in reporting or referring information that they knew to be false," *id.* at *7. Although distinguishable from this case because *Rattigan* is specific only to security clearances, *Rattigan* does emphasize the importance of predictive judgments and the deference that courts must afford Executive Branch agencies in matters concerning national security. *Id.* at *3-5.

occupy a sensitive position that implicates national security. As OPM notes, "there is nothing talismanic about eligibility for access to classified information." OPM's Br. 27. The core question is whether an agency determination concerns eligibility of an employee to occupy a sensitive position that implicates national security. When the answer to that question is in the affirmative, *Egan* applies and the Board plays a limited role in its review of the determination. We REVERSE and REMAND for further proceedings consistent with this decision.

**REVERSED AND REMANDED**

# United States Court of Appeals for the Federal Circuit

---

**JOHN BERRY, DIRECTOR, OFFICE OF PERSONNEL MANAGEMENT,**
*Petitioner,*

**v.**

**RHONDA K. CONYERS AND DEVON HAUGHTON NORTHOVER,**
*Respondents,*

**and**

**MERIT SYSTEMS PROTECTION BOARD,**
*Respondent.*

---

2011-3207

---

Petition for Review of the Merit Systems Protection Board in consolidated case nos. CH0752090925-R-1 and AT0752100184-R-1.

---

DYK, *Circuit Judge*, dissenting.

The majority, reversing the Merit Systems Protection Board ("Board"), holds that hundreds of thousands of federal employees—designated as holding national security positions—do not have the right to appeal the merits of adverse actions to the Board simply because the Department of Defense has decided that such appeals should not be allowed.

The majority reaches this conclusion even though the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. § 1101 et seq., unquestionably gives these employees the right to appeal the merits of adverse agency personnel actions to the Board, and Congress has acted specifically to deny Board jurisdiction under the CSRA with respect to certain national security agencies—the Central Intelligence Agency ("CIA"), the Federal Bureau of Investigation ("FBI"), and intelligence components of the Department of Defense—but has not exempted the non-intelligence components of the Department of Defense involved here. And the majority reaches this conclusion despite the fact that Congress in 2003 authorized the Department of Defense to create just such an exemption for its non-intelligence components and then repealed that authorization in 2009. The majority offers little explanation as to how its decision can be consistent with the CSRA other than to dismissively state that "no controlling congressional act is present here." Majority Op. at 11.

The majority's sole ground for its reversal of the Board is the Supreme Court's decision in *Department of the Navy v. Egan*, 484 U.S. 518 (1988). What the Supreme Court itself characterized as the "narrow" decision in *Egan* does not remotely support the majority's position. *See id.* at 520. It simply holds that where access to classified information is a necessary qualification for a federal position, revocation of a security clearance pursuant to the predecessor of Executive Order No. 12,968, 60 Fed. Reg. 40,245 (Aug. 2, 1995), is a ground for removal, and that the merits of the security clearance revocation are outside the Board's jurisdiction. The employees' positions here required no such access, and the employees in question had no security clearances. Far from supporting elimination of Board jurisdiction in such circumstances, *Egan* explicitly recognized that national security employ-

ees could challenge their removal before the Board. 484 U.S. at 523 n.4 (noting that where the agency fails to invoke the summary removal procedures of 5 U.S.C. § 7532, an employee's "removal . . . presumably would be subject to Board review as provided in § 7513.").

The breadth of the majority's decision is exemplified by the low level positions involved in this very case. Ms. Conyers served as a GS-05 Accounting Technician (approximately $32,000 to $42,000 annual salary range) at the Defense Finance and Accounting Service. Mr. Northover was employed by the Defense Commissary Agency as a GS-07 Commissary Management Specialist (approximately $39,000 to $50,000 annual salary range), where he performed inventory control and stock management duties. I respectfully dissent.[1]

---

[1]   Quite apart from the merits, it seems to me that Ms. Conyers's case is moot. The Office of Personnel Management ("OPM") admits that "no ongoing dispute exists between Ms. Conyers and the Department of Defense." OPM Br. at 20 n.12. Relying on *Horner v. Merit Systems Protection Board*, 815 F.2d 668 (Fed. Cir. 1987), the majority notes that although the appeal as to Ms. Conyers was dismissed as moot, "OPM . . . maintains sufficient interests in this petition to satisfy any Article III case or controversy requirement." Majority Op. at 7 n.5. I disagree. OPM's only interest in Ms. Conyers's case is in securing an advisory opinion on the requirements of federal law. Nothing is better established than the impermissibility under Article III of rendering such advisory opinions. *See Flast v. Cohen*, 392 U.S. 83, 96 (1968) ("[I]t is quite clear that the oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." (internal quotation marks omitted)).

*Horner* is readily distinguishable from this case. In *Horner*, the result of the appeal would have had consequences for the employee, as "the disciplinary action against him [would] be a nullity if [the court] overturn[ed]

# I

At the outset, it is important to be clear about the exact nature of the majority's decision. Under the majority's expansive holding, where an employee's position is designated as a national security position, *see* 5 C.F.R. § 732.201(a),[2] the Board lacks jurisdiction to review the underlying merits of any removal, suspension, demotion, or other adverse employment action covered by 5 U.S.C. § 7512. The majority holds that "the Board cannot review the merits of Executive Branch agencies' national security determinations concerning eligibility of an employee to occupy a sensitive position that implicates national security." Majority Op. at 26. The majority concedes that its holding renders "adverse actions of this type [ ] largely unreviewable."[3]   Majority Op. at 25 n.22.   Thus, the

---

the board's decision."  815 F.2d at 671.  In this case, even if the Board is overturned, Ms. Conyers will not be affected because she has already received all relief to which she is entitled based on her suspension.  *See Cooper v. Dep't of the Navy*, 108 F.3d 324, 326 (Fed. Cir. 1997) ("If an appealable action is canceled or rescinded by an agency, any appeal from that action becomes moot.").

[2]  5 C.F.R. § 732.201(a) provides, "the head of each agency shall designate, or cause to be designated, any position within the department or agency the occupant of which could bring about, by virtue of the nature of the position, a material adverse effect on the national security as a sensitive position at one of three sensitivity levels: Special–Sensitive, Critical–Sensitive, or Noncritical–Sensitive."

[3]  As OPM recognizes, under the rule adopted by the majority, "[t]he Board's review . . . is limited to determining whether [the agency] followed necessary procedures . . . [and] the merits of the national security determinations are not subject to review."  OPM Br. at 25; *see also Egan*, 484 U.S. at 530.  "The Board's review does not . . . include the merits of the underlying determination that Mr. Northover and Ms. Conyers were not eligible to occupy a

majority's holding forecloses the statutorily-provided review of the merits of adverse employment actions taken against civil service employees merely because those employees occupy a position designated by the agency as a national security position.

The majority's holding allows agencies to take adverse actions against employees for illegitimate reasons, and have those decisions shielded from review simply by designating the basis for the adverse action as "ineligibility to occupy a sensitive position." As the Board points out, the principle adopted by the majority not only precludes review of the merits of adverse actions, it would also "preclude Board and judicial review of whistleblower retaliation and a whole host of other constitutional and statutory violations for federal employees subjected to otherwise appealable removals and other adverse actions." Board Br. at 35. This effect is explicitly conceded by OPM, which agrees that the agency's "liability for damages for alleged discrimination or retaliation" would not be subject to review. OPM Br. at 25.

OPM's concession is grounded in existing law since the majority expands *Egan* to cover all "national security" positions, and *Egan* has been held to foreclose whistleblower, discrimination, and other constitutional claims. Relying on *Egan*, we have held that the Board lacks jurisdiction where a petitioner alleges that his security clearance had been revoked in retaliation for whistleblowing. *See Hesse v. Dep't of State*, 217 F.3d 1372, 1377-80 (Fed. Cir. 2000), *cert. denied*, 531 U.S. 1154 (2001). So too, the majority's decision renders unreviewable all claims of discrimination by employees in national security positions under Title VII of the Civil Rights Act of 1964,

---

sensitive position for national security reasons." OPM Reply Br. at 15.

42 U.S.C. § 2000e-5. Several circuits have held that courts lack jurisdiction to adjudicate discrimination claims where the adverse action is based on a security clearance revocation because "a Title VII analysis necessarily requires the court to perform some review of the merits of the security clearance decision," which is prohibited by *Egan*. *Brazil v. U.S. Dep't of the Navy*, 66 F.3d 193, 196 (9th Cir. 1995); *see Bennett v. Chertoff*, 425 F.3d 999, 1003 (D.C. Cir. 2005) ("While [the plaintiff] claims that [the agency's] security clearance explanation is pretextual, . . . a court cannot adjudicate the credibility of that claim.").[4] Indeed, in this case, Mr. Northover's discrimination claims were dismissed without prejudice pending the outcome of this appeal. Constitutional claims by employees occupying national security positions are also barred by the majority's decision despite the majority's contrary protestations. In *El-Ganayni v. U.S. Department of Energy*, 591 F.3d 176, 184-86 (3d Cir. 2010), the Third Circuit held that a plaintiff could not prevail on his First Amendment and Fifth Amendment claims where he alleged his security clearance had been revoked in retaliation for constitutionally protected speech and/or based on his religion and national origin.

---

[4] *See also Tenenbaum v. Caldera*, 45 F. App'x 416, 418 (6th Cir. 2002); *Ryan v. Reno*, 168 F.3d 520, 523-24 (D.C. Cir. 1999); *Becerra v. Dalton*, 94 F.3d 145, 149 (4th Cir. 1996); *Perez v. FBI*, 71 F.3d 513, 514-15 (5th Cir. 1995) ("Because the court would have to examine the legitimacy and the possibly pretextual nature of the [agency's] proffered reasons for revoking the employee's security clearance, any Title VII challenge to the revocation would of necessity require some judicial scrutiny of the merits of the revocation decision." (footnote omitted)).

II

The majority completely fails to come to grips with the statute, the fact that it provides for review of the merits of the adverse agency action involved here, and that the majority's holding effectively nullifies the statute.

The primary purpose of the CSRA—providing review of agencies' adverse employment actions—was to ensure that "[e]mployees are . . . protected against arbitrary action, personal favoritism, and from partisan political coercion." S. Rep. No. 95-969, at 19 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2723, 2741. In order to ensure such protection, the CSRA created the Board to be "a quasi-judicial body, empowered to determine when abuses or violations of law have occurred, and to order corrective action." *Id.* at 24. The protections were afforded to the vast majority of employees of the executive branch.

Subchapter II of Chapter 75 of the CSRA explicitly gives every "employee" the right to seek Board review of adverse employment actions. 5 U.S.C. § 7513(d); *see also id.* § 7701. The term "employee" is defined to include all employees in the competitive or excepted services[5] who are not serving a probationary period or under temporary

[5] The "competitive service" consists of "all civil service positions in the executive branch" with the exception of those positions that are specifically exempted by statute, those positions which are appointed for confirmation by the Senate (unless included by statute), and those positions that are in the Senior Executive Service; other civil service positions that have been "specifically included in the competitive service by statute"; and "positions in the government of the District of Columbia which are specifically included in the competitive service by statute." 5 U.S.C. § 2102(a). The "excepted service" consists of all "civil service positions which are not in the competitive service or the Senior Executive Service." *Id.* § 2103(a).

appointment, and who, in the case of excepted service employees, has completed two years of specified service.[6] An employee is entitled to appeal "a removal," "a suspension for more than 14 days," "a reduction in grade" or pay, or "a furlough of 30 days or less" to the Board. *Id.* § 7512.

In order to determine whether an adverse action constitutes arbitrary agency action, the Board necessarily examines the merits of the underlying agency decision.[7]

---

[6]    The statute defines an "employee" as:

(A) an individual in the competitive service--
    (i) who is not serving a probationary or trial period under an initial appointment; or
    (ii) who has completed 1 year of current continuous service under other than a temporary appointment limited to 1 year or less;

(B) a preference eligible in the excepted service who has completed 1 year of current continuous service in the same or similar positions--
    (i) in an Executive agency; or
    (ii) in the United States Postal Service or Postal Regulatory Commission; and

(C) an individual in the excepted service (other than a preference eligible)--
    (i) who is not serving a probationary or trial period under an initial appointment pending conversion to the competitive service; or
    (ii) who has completed 2 years of current continuous service in the same or similar positions in an Executive agency under other than a temporary appointment limited to 2 years or less . . . .

5 U.S.C. § 7511(a)(1).

[7]    *See Adams v. Dep't of the Army*, 105 M.S.P.R. 50, 55 (2007), *aff'd*, 273 F. App'x 947 (Fed. Cir. 2008) ("[W]hen the charge consists of the employing agency's withdrawal or revocation of its certification or other approval of the employee's fitness or other qualifications to hold his position, the Board's authority generally

Under 5 U.S.C. § 7513, an agency may take an adverse employment action against an employee "only for such cause as will promote the efficiency of the service." *Id.* § 7513(a). In order to demonstrate that the adverse action will promote the efficiency of the service, "the agency must show by preponderant evidence that there is a nexus between the misconduct and the work of the agency, i.e., that the employee's misconduct is likely to have an adverse impact on the agency's performance of its functions." *Brown v. Dep't of the Navy*, 229 F.3d 1356, 1358 (Fed. Cir. 2000). In evaluating whether the agency has satisfied the nexus requirement, "[t]he Board routinely evaluates such factors as loyalty, trustworthiness, and judgment in determining whether an employee's discharge will promote the efficiency of the service." *James v. Dale*, 355 F.3d 1375, 1379 (Fed. Cir. 2004) (quoting *Egan*, 484 U.S. at 537 n.1 (White, J., dissenting)). This merits evaluation is not modified merely because the removal is cloaked under the cloth of being "in the interests of national security."

The decision by Congress to afford such review to the great majority of federal employees is made clear from the history of the CSRA. Initially, review of adverse actions was extended only to preference eligibles.[8] *See United States v. Fausto*, 484 U.S. 439, 444 (1988). In 1978, Subchapter II of Chapter 75 of the CSRA was enacted to extend protections to employees in the competitive service in addition to preference eligibles, but generally not to employees in the excepted service. *See* Civil Service

---

extends to a review of the merits of that withdrawal or revocation.").

[8] A "preference eligible" generally includes veterans discharged under honorable conditions, disabled veterans, and certain family members of deceased or disabled veterans. *See* 5 U.S.C. § 2108(3).

Reform Act of 1978, Pub. L. No. 95-454, § 204(a), 92 Stat. 1111. In *United States v. Fausto*, 484 U.S. at 444, 455, the Supreme Court held that the CSRA did not cover non-preference eligible excepted service employees and that such employees could also not seek review of an adverse action in a suit for back pay in what is now the United States Court of Federal Claims.

In 1990, in response to *Fausto*, Congress expanded the CSRA to apply to all federal government employees in the competitive and excepted services with narrow exceptions (discussed below). *See* Civil Service Due Process Amendments, Pub. L. No. 101-376, 104 Stat. 461 (1990). In expanding the CSRA's reach to include employees in the excepted service, Congress recognized that "no matter how an employee is initially hired, that employee acquires certain expectations about continued employment with the Government. . . . [Excepted service employees] should have the same right to be free from arbitrary removal as do competitive service employees." H.R. Rep. No. 101-328, at 4 (1989), *reprinted in* 1990 U.S.C.C.A.N. 695, 698.

Both Ms. Conyers and Mr. Northover held permanent positions in the competitive service and both had completed more than one year of "current continuous service under other than a temporary appointment." Thus, both fall squarely within the definition of "employee" under the statute. Ms. Conyers was indefinitely suspended and Mr. Northover was reduced in grade, both adverse actions which entitle them to seek Board review. Thus, the Board had jurisdiction over both Ms. Conyers's and Mr. Northover's appeals.

That Congress clearly intended that Board review extend to these employees is made apparent by Congress's decision to craft specific exceptions to Board jurisdiction where national security was a concern, and not to extend

such exceptions to the positions involved here. In expanding the CSRA's coverage to excepted service employees in 1990, Congress created exceptions for specified employees based on national security concerns. Congress excluded particular government agencies, such as the FBI and the National Security Agency ("NSA"), "because of their sensitive missions," and also recognized that other agencies, such as the CIA, had already been specifically excluded from the CSRA by separate statute. *Id.* at 5. In 1996, the exceptions were expanded to cover all "intelligence component[s] of the Department of Defense."[9]  5 U.S.C. § 7511(b).

Congress's decision to specifically exempt certain national security positions from the protections of the CSRA provides strong evidence that it intended that Board review extend to other positions classified as national security positions that were not exempted. As the Supreme Court noted in *United States v. Brockamp*, 519

---

[9] The 1990 amendment originally excluded *inter alia* "the National Security Agency [and] the Defense Intelligence Agency" from Chapter 75 of the CSRA. Pub. L. No. 101-376, § 2. However, in 1996, Congress eliminated this language and replaced it with "an intelligence component of the Department of Defense." Pub. L. No. 104-201, § 1634(b), 110 Stat. 2422 (1996). The current version of the statute contains this language. *See* 5 U.S.C. § 7511(b). An "intelligence component of the Department of Defense" includes the NSA, the Defense Intelligence Agency, the National Geospatial-Intelligence Agency, and "[a]ny other component of the Department of Defense that performs intelligence functions and is designated by the Secretary of Defense as an intelligence component of the Department of Defense." 10 U.S.C. § 1614(2). Neither the Defense Finance and Accounting Service (where Ms. Conyers was employed), nor the Defense Commissary Agency (where Mr. Northover was employed) is an "intelligence component of the Department of Defense."

U.S. 347, 352 (1997), an "explicit listing of exceptions . . . indicate[s] to us that Congress did not intend courts to read other unmentioned . . . exceptions into the statute that it wrote." *See also TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions . . . additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980)). The governing principle is simple enough. Where Congress has crafted some exceptions for national security and not others, employees are entitled to Board review of the merits of adverse employment actions, regardless of the Department of Defense's or the majority's views that additional exceptions for national security positions would be desirable. Significantly too, in enacting 5 U.S.C. § 7532,[10] Congress provided an alternative mechanism to bypass the Board for national security purposes—an alternative not invoked here.

The majority contends that Congress's decision to exempt the FBI, CIA, and intelligence components of the Department of Defense based on national security concerns is "speculative because 'national security' was not a factor providing for these exclusions." Majority Op. at 12

---

[10] Under section 7532, "the head of an agency may suspend without pay an employee of his agency when he considers that action necessary in the interests of national security." 5 U.S.C. § 7532(a). "[T]he head of an agency may remove an employee [who has been] suspended . . . when, after such investigation and review as he considers necessary, he determines that removal is necessary or advisable in the interests of national security. The determination of the head of the agency is final." *Id.* § 7532(b). Although the agency may summarily remove an employee under section 7532, that section also provides for certain procedural protections to an employee before he or she can be removed. *See id.* § 7532(c).

n.8. The majority is clearly mistaken, as both the language and the legislative history of the exemptions created for these agencies demonstrate that these exemptions were specifically granted based on the potential impact that employees in these agencies could have on national security.

Adverse actions taken against CIA employees are governed by 50 U.S.C. § 403-4a, which was originally enacted pursuant to the National Security Act of 1947, Pub. L. No. 80-253, § 102(c), 61 Stat. 495, 498. In enacting the National Security Act of 1947, Congress acknowledged that one of the central purposes of the Act was to "establish[] a structure fully capable of safeguarding *our national security promptly and effectively*." S. Rep. No. 80-239, at 2 (1947) (emphasis added). To that end, Congress provided the Director of the CIA plenary authority to "terminate the employment of any officer or employee of the [CIA] whenever he shall deem such termination necessary or advisable in the interests of the United States." Pub. L. No. 80-253, § 102(c); *see also* 50 U.S.C. § 403-4a(e)(1).

In 1964, Congress crafted a similar exemption for employees of the NSA, modeling it after that created for the CIA in 1947. *See* Act of Mar. 26, 1964, Pub. L. No. 88-290, § 303(a), 78 Stat. 168, 169. In providing this exemption, Congress explicitly recognized that "[t]he responsibilities assigned to the [NSA] are so great, and the consequences of error so devastating, that authority to deviate from a proposed uniform loyalty program for Federal employees should be granted to this Agency." S. Rep. No. 88-926, at 2 (1964). Congress also noted that the exemption "recognizes the principle that the responsibility for control of those persons who are to have access to highly classified information should be accompanied by commensurate authority to terminate their employment when their

retention and *continued access to extremely sensitive information is not clearly consistent with the national security.*" *Id.* (emphasis added).

When Congress expanded Chapter 75 to cover employees in the excepted service in 1990, it continued to exclude the FBI, CIA, and NSA, acknowledging that "[t]he National Security Act of 1946 [sic] provides the Director of the [CIA] with plenary authority to deal with personnel of the CIA," and explained that it had "preserved the status quo in relation to the FBI and NSA *because of their sensitive missions.*" *See* H.R. Rep. No. 101-328, at 5 (emphasis added). In 1996, Congress passed the National Defense Authorization Act for Fiscal Year 1997, Pub. L. No. 104-201, 110 Stat. 2422 (1996), creating a new exemption for all "intelligence components of the Department of Defense," *id.* §§ 1632-33. This exemption is codified at 10 U.S.C. §§ 1609 and 1612, which explicitly provide the Secretary of Defense with authority to take adverse action against certain employees where "the procedures prescribed in other provisions of law [i.e. the provisions of Chapter 75] . . . cannot be invoked in a manner *consistent with the national security.*" 10 U.S.C. § 1609(a)(2) (emphasis added); *see also id.* § 1612 ("Notwithstanding any provision of chapter 75 of title 5, an appeal of an adverse action by an individual employee . . . shall be determined within the Department of Defense."). Thus, that Congress intended to exclude these agencies from the protections of Chapter 75 for national security reasons is undeniable.

The majority also appears to argue that Congress's decision to craft other exemptions for employees of other government agencies is somehow inconsistent with the notion that Congress's exclusion of the FBI, CIA, and NSA was for national security reasons. However, Congress, in enacting the CSRA, excluded certain non-intelligence agencies, such as the General Accounting

Office, the Veterans Health Sciences and Research Administration, the Postal Service, the Postal Rate Commission, and the Tennessee Valley Authority because the employees of these agencies were already provided with appeal rights through alternative mechanisms. *See* H.R. Rep. No. 101-328, at 5.

Finally, if Congress's legislative creation of certain exemptions based upon national security concerns were not enough to refute the majority's construction, there has also been an express decision by Congress to deny the national security exemptions claimed here by the Department of Defense for its non-intelligence components. In 2003, Congress enacted legislation that allowed the Department of Defense to exclude employees holding national security positions from the review procedures provided by Chapter 75 of the CSRA. *See* National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1101, 117 Stat. 1392 (2003). This legislation provided that the Secretary may "establish . . . a human resources management system [the National Security Personnel System ("NSPS")] for *some or all* of the *organizational or functional units* of the Department of Defense." *Id.* § 1101(a) (codified at 5 U.S.C. § 9902(a)) (emphasis added). Among other things, the Secretary was permitted to promulgate regulations to "establish an appeals process that provides employees . . . fair treatment in any appeals that they bring in decisions relating to their employment." *Id.* (codified at 5 U.S.C. § 9902(h)(1)(A)). Following the Secretary's promulgation of such regulations, "[l]egal standards and precedents applied before the effective date of [the NSPS] by the [Board] and the courts under chapters 43, 75, and 77 of [the CSRA] shall apply to employees of organizational and functional units included in the [NSPS], *unless such standards and precedents are inconsistent with legal*

*standards established [by the Secretary].*"  *Id.* (codified at 5 U.S.C. § 9902(h)(3)) (emphasis added).  In other words, the Secretary's regulations could bar review by the Board.

Pursuant to the statutory authorization, the Secretary promulgated regulations that in fact limited the Board's authority.  *See* Department of Defense Human Resources Management and Labor Relations Systems, 70 Fed. Reg. 66,116 (Nov. 1, 2005).  Under the regulations, "[w]here it is determined that the initial [Board] decision has a direct and substantial adverse impact on the Department's national security mission, . . . a final [Department of Defense] decision will be issued modifying or reversing that initial [Board] decision."  *Id.* at 66,210 (codified at 5 C.F.R. § 9901.807(g)(2)(ii)(B)).  Thus, a Board decision reversing an agency's adverse action was subject to veto by the agency if it was determined to have "a direct and substantial adverse impact on the Department's national security mission"—a less draconian version of the agency authority asserted here.  Also, under the regulations, if the Secretary determined "in his or her *sole, exclusive, and unreviewable discretion* [that an offense] has a direct and substantial adverse impact on the Department's national security mission," *id.* at 66,190 (codified at 5 C.F.R. § 9901.103) (emphasis added), the Board could not mitigate the penalty for such an offense, *id.* at 66,210 (codified at 5 C.F.R. § 9901.808(b)).

On January 28, 2008, Congress amended the NSPS statute to eliminate the Department of Defense's authority to create a separate appeals process and invalidate the existing regulations limiting Board authority established by the Secretary, *see* National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1106(a), (b)(3), 122 Stat. 3, 349, 356-57, bringing the "NSPS under Governmentwide rules for disciplinary actions and employee appeals of adverse actions," National Security

Personnel System, 73 Fed. Reg. 56,344, 56,346 (Sept. 26, 2008).[11] The repeal of the Department of Defense's authority to create a separate appeals process (exempting employees from Board review) and the repeal of Secretary's regulations implementing this appeals process demonstrate conclusively that Congress intended to preclude the Department of Defense from insulating adverse employment decisions as to employees of non-intelligence components from Board review on the merits.

The majority's argument to the contrary is unconvincing. The majority is incorrect in suggesting that the repeal of these provisions was due to concerns about collective bargaining. *See* Majority Op. at 12 n.8. In fact, the provisions of the NSPS limiting collective bargaining were addressed in a 2008 amendment to a separate provision in response to litigation brought by labor organizations on behalf of Department of Defense employees.[12] *See Am. Fed'n of Gov't Emps., AFL-CIO v. Gates*, 486 F.3d 1316 (D.C. Cir. 2007). The 2008 amendment to the collective bargaining provisions had nothing to do with the repeal of the Chapter 75 exemption authority or the repeal of the regulations restricting adverse action appeal rights. As the Department of Defense itself noted, the restoration of adverse action appeal rights to its

---

[11] The remaining statutory provisions creating the NSPS were ultimately repealed on October 28, 2009. *See* National Defense Authorization Act for Fiscal Year 2010, Pub. L. No. 111-84, § 1113(b), 123 Stat. 2190, 2498 (2009); *see also* National Security Personnel System, 76 Fed. Reg. 81,359 (Dec. 28, 2011) (repealing regulations implementing the NSPS effective January 1, 2012).

[12] The provisions of the NSPS concerning collective bargaining were contained in subsection (m) of 5 U.S.C. § 9902, whereas the provisions relating to adverse action appeal rights were contained in subsection (h), and had nothing to do with collective bargaining.

employees was designed to "[b]ring[] NSPS under Governmentwide rules for disciplinary actions and employee appeals of adverse actions." National Security Personnel System, 73 Fed. Reg. at 56,346. The Department of Defense cannot now claim authority specifically denied by Congress.

### III

The majority suggests that cases such as *Dames & Moore v. Regan*, 453 U.S. 654 (1981), and *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), recognizing the existence of Presidential authority to act even when Congress has not, support the agency action here. *See* Majority Op. at 13. There are three serious flaws with this argument. First, as the majority itself recognizes, the President cannot act contrary to congressional legislation except perhaps in the most unusual circumstances—which are not claimed to exist here.[13] As described immediately above, Congress has acted to provide for Board review.

Second, this case does not involve a Presidential action. *Dames* and *Youngstown* both involved agency action taken pursuant to an Executive Order of the President. *See Dames*, 453 U.S. at 662-63 (Executive Order authorized the Secretary of the Treasury to promulgate regulations to block the removal or transfer of all property held by the government of Iran); *Youngstown*, 343 U.S. at 582-83 (Executive Order directed the Secretary of Commerce to seize the nation's steel mills). The only Executive

---

[13] *See Youngstown*, 343 U.S. at 637 (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.").

Orders that are potentially relevant here are Executive Order No. 12,968, 60 Fed. Reg. 40,245, and Executive Order No. 10,450, 18 Fed. Reg. 2489. Neither grants the agency the authority it now seeks.

Executive Order No. 12,968, prior versions of which formed the basis for *Egan*, relates exclusively to "access to classified information." It delegates to the heads of executive agencies the responsibility to "establish[] and maintain[] an effective program to ensure that access to classified information by each employee is clearly consistent with the interests of the national security," and sets forth the conditions under which employees may be granted access to classified information. Exec. Order No. 12,968, § 1.2(b)-(e), 60 Fed. Reg. at 40,246-47. It provides that an agency's decision to revoke an employee's security clearance shall be "final." *Id.* § 5.2(b). Executive Order No. 12,968 has nothing to do with this case because the agency's adverse employment actions against Ms. Conyers and Mr. Northover were not based on denials of eligibility to access classified information, and neither position involved in this case required a security clearance or access to classified information.

Executive Order No. 10,450 provides that the heads of government agencies and departments "shall be responsible for establishing and maintaining within [their] department or agency an effective program to insure that the employment and retention in employment of any civilian officer or employee within the department or agency is clearly consistent with the interests of the national security." Exec. Order No. 10,450, § 2, 18 Fed. Reg. at 2489. The order also delegates to agencies the authority to determine investigative requirements for positions "according to the degree of adverse effect the occupant of the position . . . could bring about . . . on the national security." *Id.* § 3; *see also* 5 C.F.R. § 732.201

(setting forth the three levels of sensitivity). Nothing in the order in any way suggests that those falling into a sensitive category should be exempt from Board review. Rather, the order provides for the alternative removal mechanism provided in section 7532. Where an agency head determines that continued employment of an employee is not "clearly consistent with the interests of the national security," the agency head "shall immediately suspend the employment of the person involved if he deems such suspension necessary in the interests of the national security and, following such investigation and review as he deems necessary, the head of the department or agency concerned shall terminate the employment of such suspended officer or employee whenever he shall determine such termination necessary or advisable in the interests of the national security, in accordance with the said act of August 26, 1950."[14]  *Id.* § 6. As the Supreme Court previously noted, "it is clear from the face of the Executive Order that *the President did not intend to override statutory limitations on the dismissal of employ-*

---

[14] The Act of Aug. 26, 1950, Pub. L. No. 81-733, 64 Stat. 476, was the predecessor to 5 U.S.C. § 7532. It provided:

> [N]otwithstanding . . . the provisions of any other law, [designated agency head] may, in his absolute discretion and when deemed necessary in the interest of national security, suspend, without pay, any civilian officer or employee of the [agency] . . . . The agency head concerned may, following such investigation and review as he deems necessary, terminate the employment of such suspended civilian officer or employee whenever he shall determine such termination necessary or advisable in the interest of the national security of the United States, and such determination by the agency head concerned shall be conclusive and final.

*ees, and promulgated the Order solely as an implementa-tion of the 1950 Act*," i.e., what is now 5 U.S.C. § 7532. *Cole v. Young*, 351 U.S. 536, 557 n.20 (1956) (emphasis added). The "statutory limitations" in question in *Cole* required review of adverse employment actions with respect to those employees enjoying veterans' preference rights, and served as the predecessor of the current Chapter 75 which protects federal civil service employees generally. *See* Veterans' Preference Act of 1944, ch. 287, 58 Stat. 387, 390-91.[15] If Executive Order No. 10,450 did not override the earlier limited protections, it can hardly be read to override the later-enacted expanded protections in the current CSRA. Thus, neither Executive Order No. 12,968 nor Executive Order No. 10,450 authorizes agencies to insulate adverse employment actions from Board review where the employees occupy a national security position, outside the context of security clearance revocations or actions under section 7532—neither of which exists here.

Third, neither *Dames* nor *Youngstown* supports *agency* (as opposed to Presidential) action independent of congressional authorization. An agency cannot administratively create authority for agency action. "Agencies are created by and act pursuant to statutes." *Elgin v. Dep't of the Treasury*, 132 S. Ct. 2126, 2136 n.5 (2012). An agency may not act "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706. Agencies "act[] as a delegate to the legislative power," and

---

[15] Prior to enactment of the CSRA in 1978, "only veterans enjoyed a statutory right to appeal adverse personnel action to the Civil Service Commission (CSC), the predecessor of the MSPB." *Fausto*, 484 U.S. at 444; *see also* 5 U.S.C. § 7701 (1976) ("A preference eligible employee . . . is entitled to appeal to the Civil Service Commission from an adverse decision . . . of an administrative authority so acting.").

"[a]n agency may not finally decide the limits of its statutory power. That is a judicial function." *Social Sec. Bd. v. Nierotko*, 327 U.S. 358, 369 (1946). As the Supreme Court noted in *Ernst & Ernst v. Hochfelder*, even where an agency has been given the authority to fill gaps in the statute, "[t]he rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law. Rather, it is the power to adopt regulations to carry into effect the will of Congress as expressed by the statute." 425 U.S. 185, 213-14 (1976) (internal quotation marks omitted); *see also Addison v. Holly Hill Fruit Prods., Inc.*, 322 U.S. 607, 616 (1944) ("The determination of the extent of authority given to a delegated agency by Congress is not left for the decision of him in whom authority is vested."). Where, as here, Congress has not authorized the agency to limit Board review of its decisions, and has indeed revoked such authorization, the agency acts in excess of its statutory authority.

IV

The majority contends that the Supreme Court's decision in *Department of the Navy v. Egan*, 484 U.S. 518, supports the exemption of all national security positions from Board jurisdiction over the merits of adverse actions. Majority Op. at 10-12. However, the Supreme Court itself made clear that *Egan*'s holding is limited to addressing the "*narrow* question" of "whether the [Board] has authority by statute to review the substance of an underlying decision to *deny or revoke a security clearance* in the course of reviewing an adverse action." *Egan*, 484 U.S. at 520 (emphasis added). Indeed, every other circuit that has considered *Egan* has uniformly interpreted it as

relating to security clearance determinations.[16] The *Egan*
Court treated the revocation or denial of a security clear-
ance as a failure to satisfy a job qualification where
determinations as to underlying basis for the qualifica-
tion—whether a security clearance should be granted—
had been constitutionally committed to the discretion of
another party—the President. *See id.* at 520 ("[A] condi-
tion precedent to Egan's retention of his employment was
'satisfactory completion of security and medical reports.'");
*id.* at 522 ("Without a security clearance, respondent was
not eligible for the job for which he had been hired."); *see
also id.* at 527 ("The authority to protect [classified]
information falls on the President as head of the Execu-
tive Branch and as Commander in Chief.").

Where an employee fails to satisfy a qualification re-
quired for a position and the determination as to whether
the employee is eligible for the qualification is committed
to the discretion of a third party, it is unsurprising that
the Board's inquiry is limited to whether the job was

---

[16] *See, e.g., Rattigan v. Holder*, No. 10-5014, 2012
WL 2764347, at *3 (D.C. Cir. July 10, 2012) ("*Egan*'s
absolute bar on judicial review covers only security clear-
ance-related decisions made by trained Security Division
personnel . . . ."); *Zeinali v. Raytheon Co.*, 636 F.3d 544,
549-50 (9th Cir. 2011) ("The core holding[] of Egan . . . [is]
that federal courts may not review the merits of the
executive's decision to grant or deny a security clear-
ance."); *Makky v. Chertoff*, 541 F.3d 205, 213 (3d Cir.
2008) ("[Courts] have jurisdiction to review [claims that]
do[] not necessarily require consideration of the merits of
a security clearance decision."); *Duane v. U.S. Dep't of
Defense*, 275 F.3d 988, 993 (10th Cir. 2002) ("*Egan* held
that the Navy's substantive decision to revoke or deny a
security clearance-along with the factual findings made
by the AJ in reaching that decision-was not subject to
review on its merits by the Merit Systems Protection
Board.").

conditioned on a particular qualification and whether the employee's qualifying status had been revoked. *See id.* at 530. In this vein, the Board has held that it lacks authority to evaluate the merits of a decision to revoke an attorney's bar license, or an employee's reserve membership, where such license or membership is required for a particular government position. *See, e.g.*, *Buriani v. Dep't of the Air Force*, 777 F.2d 674, 677 (Fed. Cir. 1985) (holding that the Board should not examine the merits of the Air Force's decision to remove an employee from reserve membership); *McGean v. NLRB*, 15 M.S.P.R. 49, 53 (1983) (holding that "the Board is without authority to review the merits" of a decision to suspend an attorney's membership in the Bar).[17]

Contrary to the majority, *Egan* turned solely on the President's constitutional "authority to classify and control *access to information* bearing on national security

---

[17] *See Williams v. U.S. Postal Serv.*, 35 M.S.P.R. 581, 589 (1987) ("[T]he Board's refusal to examine reasons for bar decertification where the employee is removed for failure to maintain bar membership is firmly grounded in its refusal to collaterally attack the decision of another tribunal, statutorily charged with the authority to render the decision under review. . . . The Board also affords discretion to the military on matters peculiarly within its expertise because '[t]he military constitutes a specialized community governed by a separate discipline from that of the civilian' and it is not within the role of the judiciary to intervene in the orderly execution of military affairs." (quoting *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953))); *see also Christofili v. Dep't of the Army*, 81 M.S.P.R. 384, 392 (1999) ("It is well-settled that the regulation of the practice of law and the discipline of members of a state bar is exclusively a state court matter."); *Egan v. Dep't of the Navy*, 28 M.S.P.R. 509, 518 (1985) ("In all these contexts, the underlying actions, *i.e.*, termination of reserve status . . . and bar decertification, are committed to appropriate procedures within the respective entities . . . .").

and to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person *access to such information.*" 484 U.S. at 527 (emphasis added). Just as the authority to revoke an attorney's bar license or a military member's reserve status lies with an expert third party (the highest court of a state or the military), the authority to protect classified information "falls on the President as head of the Executive Branch and as Commander in Chief." *Id.* As the Supreme Court noted, Presidents have exercised such authority through a series of Executive Orders. *Id.* at 528 (citing Executive Orders); *see also* Exec. Order No. 12,968, 60 Fed. Reg. 40,245. As noted, those Executive Orders provide that the agency decision to revoke a security clearance shall be "final." As discussed above, no similar Executive Order purporting to make the agency decision "final" exists here. Contrary to the majority, *Egan* has been uniformly treated as limited only to limiting review of the underlying merits of the Executive Branch's decision to revoke or deny a security clearance, and has not been expanded to apply to all conduct that may have the potential to impact national security. *See, e.g., Bennett*, 425 F.3d at 1002 ("[T]he two determinations [suitability for federal employment and eligibility for security clearance] are subject to different processes of review: whereas suitability determinations are subject to appeals to the Merit Systems Protection Board and subsequent judicial review, security clearance denials are subject to appeal within the agency." (internal citations omitted)).[18] *Egan* itself recognized that national security

---

[18] *See also, e.g., Jacobs v. Dep't of the Army*, 62 M.S.P.R. 688, 695 (1994) ("The Supreme Court's decision in *Egan* was narrow in scope and specifically applied only to security clearance revocations."); *Cosby v. Fed. Aviation Admin.*, 30 M.S.P.R. 16, 18 (1986) ("*Egan* addresses only those adverse actions which are based substantially on an

employees can otherwise challenge adverse employment actions before the Board, such that Egan's "removal . . . presumably would be subject to Board review as provided in § 7513." 484 U.S. at 523 n.4. In this case, Ms. Conyers and Mr. Northover were not required to have a security clearance in order to hold their respective positions. Thus, *Egan* is inapplicable.

The majority's reliance on *Carlucci v. Doe*, 488 U.S. 93 (1988), is also misplaced. Unlike the employees here, the NSA employee in *Carlucci* had been specifically exempted from the provisions of the CSRA providing for Board review of adverse actions. *See id.* at 96; *see also* 10 U.S.C. § 1612(3) (providing that appeals of such adverse actions must take place exclusively within the Department of Defense pursuant to procedures prescribed by the Secretary).

\* \* \*

In summary, Congress's decision is clear—with the exception of designated agencies such as the CIA, FBI, and intelligence components of the Department of Defense, employees may challenge the merits of adverse actions before the Board. At the same time Congress has provided a safety valve in section 7532, allowing the agencies to summarily remove employees "when, after such investigation and review as [the agency head] considers necessary, he determines that removal is necessary or advisable in the interests of national security." 5 U.S.C. § 7532(b). It is not the business of the Department of Defense, the Office of Personnel Management, or this court to second-guess the congressional decision to provide Board review. I respectfully dissent.

---

agency's revocation or denial of an employee's security clearance.").